IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-396-FL

SIAVASH MOJARRAD, Administrator of )
THE ESTATE OF SOHEIL ANTONIO )
MOJARRAD, )
 )
                    Plaintiff, )
 )     **DEFENDANT CITY OF RALEIGH'S**
    v. )     **LOCAL RULE 56.1 STATEMENT**
 )     **OF MATERIAL FACTS**
WILLIAM BRETT EDWARDS, *in his* )
*individual capacity and* CITY OF RALEIGH, )
NORTH CAROLINA, )
 )
                    Defendants. )

        Pursuant to Local Rule 56.1, and in support of Defendant City of Raleigh's Motion for

Summary Judgment, the City of Raleigh (hereinafter, the "City"), offers the following statement

of material facts as to which there is no genuine dispute

**Material Allegations from the Amended Complaint**

        1.      Soheil Antonio Mojarrad was shot and killed by Defendant Edwards, a police

officer at the Raleigh Police Department (hereinafter, the "RPD") on April 20, 2019. [Amnd.

Compl., D.E. 38, ¶ 1.]

        2.      Defendant William Brett Edwards (hereinafter, "Officer Edwards") is and was at

all relevant times a patrol officer at the RPD, located in Raleigh, Wake County, North Carolina.

[Amnd. Compl., D.E. 38, ¶ 6.]

        3.      The City of Raleigh, North Carolina was and is a political subdivision and city in

the State of North Carolina. Cassandra Deck-Brown was at all relevant times the Chief of Police

1

for the City of Raleigh, North Carolina. In that position, she was the administrative head of the RPD, and prepared the policies for the Department. Ruffin Hall was at all relevant times the City Manager for the for the City of Raleigh, North Carolina. In that position, Hall had final approval over the policies implemented by the RPD. Defendant City of Raleigh is located in Wake County, North Carolina.  [Amnd. Compl., D.E. 38, ¶ 7.]

4.     The RPD enacted Executive Policy 1108-01, which governs the use of force and weapons, on October 7, 2016. This policy was prepared by Cassandra Deck-Brown and approved by Ruffin Hall, and is the relevant policy in place at the time of Mr. Mojarrad's death.  [Amnd. Compl., D.E. 38, ¶ 64.]

### The Parties' Designated Expert Witnesses

5.     The City has designated John Eric Combs as an expert witness who may present evidence at trial.  [City of Raleigh's Designation of Expert Witness at 2.]

6.     Mr. Combs has over 34 years of service in the law enforcement profession and over 27 years of service as a law enforcement trainer.  He has served as a law enforcement officer, law enforcement and criminal justice instructor and trainer, an educator, law enforcement consultant, and expert witness.  [Combs Decl. ¶ 1, p. 1.]

7.     The City has designated Isaac Avery as an expert witness who may present evidence at trial.  [City of Raleigh's Designation of Expert Witness at 1.]

8.     Mr. Avery has been licensed to practice law in the State of North Carolina since 1974.  From its inception in 1977 until his retirement on October 31, 2003, Mr. Avery served as legal advisor to the North Carolina Department of Crime Control and Public Safety where he provided legal and policy advice to numerous statewide, civil, and military law enforcement agencies.  Mr. Avery has also held positions at North Carolina State University and Campbell

2

University Law School teaching on topics related to policies, management and supervision of law enforcement agencies. Finally, Mr. Avery has taught basic and in-service classes to thousands of law enforcement officers through the Department of Crime Control and Public Safety and the North Carolina Justice Academy, including motor vehicle law; arrest, search and seizure; criminal law; civil liability; personnel law; and constitutional law. [Avery Decl. ¶¶ 1-5, pp. 1-2.]

9.     Mr. Avery has reviewed many of the pleadings and discovery materials generated by the parties to this lawsuit, policies and training materials of the RPD, numerous personnel and internal affairs records of Officer Edwards, and investigative files pertaining to the events of April 20, 2019. [Avery Decl. ¶ 6, pp. 2-3.]

10.     Officer Edwards has designated John Ryan as an expert witness who may present evidence at trial. [Edwards' Expert Witness Designation of John Ryan, p. 1.]

11.     Since 1981, Mr. Ryan has been actively involved in police practices and law enforcement. During his career, he has served as an active-duty police officer; an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island; a law enforcement trainer; an author on law enforcement topics, and a law enforcement consultant. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶¶ 1-47, pp. 33-42.]

12.     Mr. Ryan has reviewed many of the pleadings and discovery materials generated by the parties to this lawsuit, policies and training materials of the RPD, numerous personnel and internal affairs records of Officer Edwards, and investigative files pertaining to the events of April 20, 2019. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶¶ 1-47, p. 42, Attachment A pp. 78-92.]

13.     Plaintiff has designated Geoffrey P. Alpert, Ph.D., a professor of Criminology and Criminal Justice at the University of South Carolina, as an expert witness who may present

evidence at trial. [Pl's Supp. Rule 26(a) Disclosures, pp. 1-3; Preliminary Report of Geoffrey P. Alpert, p. 1.]

14. Plaintiff has designated Jeffrey J. Noble, former Deputy Police Chief for the City of Irvine, California, as an expert witness who may present evidence at trial. [Pl's Supp. Rule 26(a) Disclosures, pp. 1-3; Expert Report of Jeffrey J. Noble, p. 1.]

15. Plaintiff has designated Michael A. Jones, former Chief of Police for the Virginia Capitol Police, as an expert witness who may present evidence at trial. [Pl's Supp. Rule 26(a) Disclosures, pp. 1-3; Rule 26 Report of Michael A. Jones, p. 10.]

**The Raleigh Police Department and Its Policies**

16. The RPD is a law enforcement agency certified by the Commission on Accreditation of Law Enforcement Agencies, Inc. (CALEA). [Avery Decl. ¶ 26, pp. 7-8.]

17. Approximately 25% of law enforcement officers nationwide work for CALEA accredited agencies. [Avery Decl. ¶ 26, pp. 7-8.]

18. CALEA was established for the purpose of enhancing law enforcement as a profession. The twenty-four (24) month CALEA certification process is used to determine if the law enforcement agency has in place policies and directives which will strengthen the agency's accountability within the agency and the community. During the process, CALEA staff reviews the agency's policies and training materials and performs a site visit to determine if the policies and practices meet CALEA standards. The evaluation includes 207 standards for assuring agency policy provides for proper hiring, training, supervision, and discipline of law enforcement employees and compliance with Constitutional requirements by law enforcement employees. [Avery Decl. ¶ 26, pp. 7-8.]

4

19.    Following initial accreditation, there is an annual review and an additional on-site review by CALEA staff every four years.  [Avery Decl. ¶ 26, pp. 7-8.]

20.    The RPD's continuing CALEA certification shows a commitment to best practices. [Avery Decl. ¶ 27, p. 8.]

21.    In his role as an expert witness for Officer Edwards, Mr. Ryan has testified that he believes that all of the RPD policies he reviewed were consistent with best practices.  Mr. Ryan believes that the RPD's policies are more restrictive than most agencies, and that the RPD adopts best-practice policies rather than what's commonly referred to as "legal-based" policies.  [Ryan Depo. at 164.]

22.    In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he has found no legal, administrative or social frameworks within the RPD that contributed to officer misconduct.  [Alpert Depo. at 132-133.]

23.    Dr. Alpert has testified that he does not have sufficient information to conclude that the RPD has any custom or practice of unconstitutional policing.  [Alpert Depo. at 140.]

24.    In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he was engaged by the Plaintiff to evaluate the RPD's policies.  [Noble Depo. at 104.]

25.    Mr. Noble has testified that he found no evidence that would enable him to conclude that any of the RPD's policies were reckless or deliberately indifferent.  [Noble Depo. at 132.]

26.    Mr. Noble has testified that he found no evidence that the City or the RPD knew that its inadequate policies, customs, practices, training and supervision created a substantial risk of harm to the citizens of Raleigh.  [Noble Depo. at 131.]

### The Raleigh Police Department's Policies, Customs and Practices Regarding Use of Force

5

27.     The RPD's Use of Force and Weapons policy is set forth in DOI 1108-1.   This

policy governed Officer Edwards on April 20, 2019.  [Rowland Depo. at 30-33; Rowland Depo.

Ex. 4.]

28.     RPD DOI 1108-1 directs officers as follows:

Force should be used only when all other means of resolving a situation have been
exhausted or are clearly inapplicable. Force will be used only to the degree
reasonably necessary to control the situation. The extent of force in terms of degree
and level will vary according to the situation. The nature of the offense, the physical
make-up of the parties involved, actions of third parties who may be present,
potential for injury to officers, citizens or suspects, the risk of escape, the
availability of alternatives and other exigent circumstances are factors to be
considered.

Officers are required to make split second decisions in quickly evolving
circumstances. Officers must continuously evaluate the need for force and be
prepared to respond to changing circumstances which could include the need to
escalate the force used, de-escalate the force used or to disengage from the use of
force. It must be stressed that the use of force is not left to the unfettered discretion
of the involved officer. This is not a subjective determination. The use of force must
be objectively reasonable. The officer must only use that force which a reasonably
prudent officer would use under the same or similar circumstances.

[Rowland Depo. Ex. 4, p. 2.]

29.     With regard to the "Objectively Reasonable" standard, RPD DOI 1108-1 states,

The term "Objectively Reasonable" means that, in determining the necessity for
force and the appropriate level of force, officers shall evaluate each situation in
light of the known circumstances, including, but not limited to, the seriousness of
the crime, the level of threat or resistance presented by the subject, and the danger
to the community.

Nothing in this policy shall be construed as approving the unwarranted, reckless or
excessive use of force.

It shall be the duty of every officer of this agency to attempt to prevent any other
officer from using unwarranted, reckless, or excessive force. Any officer who
witnesses or has knowledge of unwarranted, reckless, or excessive force by another
officer shall immediately report the incident to a supervisor or the Internal Affairs
Unit.

[Rowland Depo. Ex. 4, p. 2.]

6

30.     RPD DOI 1108-1 defines "deadly force" as "force likely to cause serious physical injury or death," and "serious physical injury" as bodily injury that causes serious permanent disfigurement, or which causes permanent or protracted loss, or impairment of the function of any bodily member or organ."  [Rowland Depo. Ex. 4, p. 3.]

31.     RPD DOI 1108-1 limits the authority of RPD officers to use deadly force as follows:

> Although N.C.G.S. 15A-401(d)(2)(c) permits the use of deadly force to prevent the escape of a person from custody imposed upon him as a result of a conviction for a felony, it is the policy of our Department that this authority is primarily intended to be exercised by NC Department of Corrections personnel, and that Raleigh police officers will use deadly force only as permitted under the following circumstances:
>
> - In self-defense or defense of a third person from what the officer reasonably believes to be the use or imminent use of deadly physical force.
>
> - To arrest or prevent the escape of a person whom the officer reasonably believes is attempting to escape by the use of a deadly weapon.
>
> - To arrest or prevent the escape of a person who, by his conduct or any other means, indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay.

[Rowland Depo. Ex. 4, p. 3.]

32.     RPD DOI 1108-1 contains a Linear Use of Force Continuum and explains,

> Officers will assess the totality of the circumstances to determine the level of force that is reasonable in each case. Officers may consider the following use of force continuum as a guide when deciding when to use force and how much force to use. A continuum of force is a tool to assist an officer in understanding force options.

[Rowland Depo. Exhibit 4, p 3.]

33.     The Linear Use of Force Continuum set forth in RPD DOI 1108-1 sets forth and explains the following levels of force, progressing from lower to higher:

- Physical Presence

- Verbal Commands

- Restraining Techniques

- Pepper Gas

- Striking Techniques

- Less Lethal Weapons

- Deadly force

[Rowland Depo. Ex. 4, pp. 3-5.]

34.     RPD DOI 1108-1 warns RPD officers that, "[o]fficers should use a firearm as a last resort, when other means have failed or are inapplicable," and that "[o]fficers may not discharge their firearms except where the use of deadly force would be justified or during approved firearm training." [Rowland Depo. Ex. 4 p. 9.]

35.     RPD DOI 1108-1 further limits the authority of RPD officers to use firearms by prohibiting warning shots and firing a weapon from a moving vehicle. In addition, RPD DOI 1108-1 prohibits firing a weapon while running or at a moving vehicle except under limited circumstances involving imminent use of deadly force against the officer or a third party. [Rowland Depo. Ex. 4, pp. 9-10.]

36.     For all incidents involving the use of force or a complaint of injury by a civilian, RPD DOI 1108-1 requires officers to submit a written *Use of Force/Complaint of Injury Report* to a supervisor as soon as possible. A supervisor who was not involved in the use of force then reviews the report, makes a recommendation, and forwards the report through the chain of command. Ultimately, these reports are reviewed by the Office of Professional Standards Major and maintained by the Internal Affairs Unit. [Rowland Depo. Ex. 4, p. 11.]

37.     RPD DOI 1108-1 informs officers that *Use of Force/Complaint of Injury Reports* are used to "document and evaluate employee performance," and that "[t]hese reports will be

8

evaluated to determine: whether administrative or criminal investigations are warranted; whether there is adherence to policies and procedures; and/or, whether there are needs for amended or remedial training." [Rowland Depo. Ex. 4, p. 11.]

38.   The RPD's use of force policy in effect on April 20, 2019 is consistent with policies of other police agencies in North Carolina and throughout the country, and complies with the state law restrictions on the use of force by law enforcement officers. [Avery Decl. ¶ 6, pp. 2-3; ¶ 15, p. 5.]

39.   The RPD's policies restricting the use of force by RPD officers are consistent with policies of other law enforcement agencies and adequately restrict the use of force to prevent the inappropriate use of force against persons RPD officers encounter during performance of their duties. [Avery Decl. ¶ 25, p. 7.]

40.   In his role as an expert witness for Officer Edwards, Mr. Ryan has reviewed the RPD's policy on use of force. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶¶ 1-47, p. 42, Attachment A pp. 78-92.]

41.   Mr. Ryan believes that the RPD has a comprehensive Use of Force and Weapons Policy. The policy is more restrictive than the generally accepted practice by including such language as "Force should be used only when other means of resolving a situation have been exhausted or are clearly inapplicable." The policy directs that force will only be used to the degree reasonably necessary to control the situation. The policy includes the objective reasonableness standard consistent with the United States Constitution. Pursuant to the RPD's use of force policy, officers are authorized to use deadly force, "In self-defense or defense of a third person from what the officer reasonably believes to be the use or imminent use of deadly physical force." [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 168, p. 76.]

42. In his role as an expert witness for the Plaintiff, Mr. Noble has reviewed the RPD's use of force policy. [Expert Report of Jeffrey J. Noble, ¶ 8, pp. 4-6.]

43. Mr. Noble has testified that after evaluating the RPD's use of force policy, he found nothing incorrect or inconsistent with national law enforcement practices. [Noble Depo. at 103-104.]

44. Mr. Noble has testified that he has no criticisms of the RPD's use of force policy. [Noble Depo. at 103.]

45. In his role as an expert witness for the Plaintiff, Dr. Alpert has reviewed RPD policy 1108-01 entitled *Use of Force and Weapons* and policy 1108-08 entitled *Firearms*. [Preliminary Report of Geoffrey P. Alpert, p. 2.]

46. Dr. Alpert has testified that he does not believe that the RPD's use of force policies are deficient in any way. [Alpert Depo. at 117.]

47. RPD DOI 1108-1 contains everything that RPD officers learn and know with respect to the use of force. The RPD has no unwritten customs or standard practices regarding the use of force that are not contained in DOI 1108-1. [Rowland Depo. at 32-33.]

48. In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he found no evidence that any unofficial policies of the RPD were deficient with respect to use of force. [Noble Depo. at 129-130.]

49. Mr. Noble has testified that he found no evidence that any official or unofficial policies of the RPD permitted rampant unaccountability for officers in use of force scenarios. [Noble Depo. at 131.]

50.     In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he is unable to offer an opinion that the RPD's informal policies, customs or practices with respect to use of force are deficient.  [Alpert Depo. at 118-119.]

**The Raleigh Police Department's Policies, Customs**
**and Practices Regarding Interactions with Mentally Ill Persons**

51.     The RPD has a written policy with regard to encountering individuals with mental health issues.  The policy is DOI 1109-12 entitled Itinerants, Inebriants, and Mental Health Customers.  [Slade Depo. at 53.]

52.     In his role as an expert witness for Officer Edwards, Mr. Ryan has reviewed the RPD's policy entitled Itinerants, Inebriates and Mental Health Consumers.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 49, p. 41, Attachment A, pp. 78-92.]

53.     Mr. Ryan believes that the RPD has a comprehensive policy on Itinerants, Inebriates, and Mental Subjects.  The policy is dated 10-09-2017, and notes that the RPD offers officers the opportunity to participate in Crisis Intervention Team training on a voluntary basis. The RPD provides officers of the agency with a comprehensive resource guide for Crisis Intervention.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 169, p. 76.]

54.     In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he has no criticisms of the RPD's policies regarding officer interactions with mental health consumers. [Noble Depo. at 103.]

55.     Mr. Noble has testified that he found no evidence that any unofficial policies of the RPD were deficient with respect to officer interactions with mental health consumers.  [Noble Depo. at 130.]

56.     In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he does not believe that the RPD's policies regarding interactions with mental health consumers are deficient.  [Alpert Depo. at 117.]

57.     Dr. Alpert has testified that he is unable to offer an opinion that the RPD's informal policies, customs or practices with respect to officer interactions with mental health consumers are deficient.  [Alpert Depo. at 119-120.]

### The Raleigh Police Department's Policies, Customs and Practices Regarding Body-Worn Cameras

58.     There is no national law enforcement agency standard on body-worn-cameras (hereinafter, "BWC" or "BWCs").  [Jones Depo. at 93.]

59.     There is no law enforcement standard requiring law enforcement agencies to sync BWCs with vehicle cameras.   [Jones Depo. at 114.]

60.     There is no North Carolina state standard for the use of BWCs by law enforcement agencies.  [Jones Depo. at 93.]

61.     There is no legal requirement in North Carolina requiring a law enforcement agency to use cameras.  [Avery Decl. ¶ 20.]

62.     The RPD's policy and training on use of cameras is consistent with an agency which is using best practices in operating its police department.  [Avery Decl. ¶ 20, p. 6.]

63.     In his role as an expert witness for the Plaintiff, Mr. Jones has testified that he believes that the RPD's BWC policy did not violate any national or state BWC policies applicable to law enforcement agencies.  [Jones Depo. at 93-94.]

64.     In their roles as expert witnesses for the Plaintiff, Mr. Jones and Mr. Noble have testified that the RPD's BWC policy correctly required Officer Edwards to activate his BWC prior to interacting with Mr. Mojarrad.  [Jones Depo. at 106; Noble Depo. at 103.]

65.     Mr. Noble has testified that he has no criticisms of the RPD's BWC policies. [Noble Depo. at 103.]

66.     Mr. Noble has testified that he found no evidence that any unofficial policies of the RPD were deficient with respect to BWCs.  [Noble Depo. at 130.]

67.     In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he does not believe that the RPD's BWC policy is deficient in any way.  [Alpert Depo. at 117.]

68.     Dr. Alpert has testified that he is unable to offer an opinion that the RPD's informal policies, customs or practices with regarding BWCs are deficient.  [Alpert Depo. at 120.]

69.     Dr. Alpert has testified that he does not believe that Officer Edwards' use of his BWC would have prevented his use of force.  [Alpert Depo. at 144-145.]

70.     Mr. Jones has testified that he does not believe that the RPD's BWC policy affected Officer Edwards' decision to use deadly force against Mr. Mojarrad.  [Jones Depo. at 110-112.]

71.     Neither the RPD policy on use of body cameras, the training of RPD officers on when to activate body cameras, nor Officer Edwards' failure to activate his camera caused the use of deadly force by Officer Edwards.  [Avery Decl. ¶ 30, p. 8.]

### The Raleigh Police Department's Policies Regarding Internal Investigations

72.     The RPD has a comprehensive policy on Internal Affairs Investigations. This policy notes that anonymous complaints will be accepted, and that discipline may be imposed if the complaint is substantiated through investigation.  The policy notes that the agency utilizes the "blue team" report, which is part of the IAPro system. The RPD internal affairs policy is consistent with best practices nationwide.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 166, pp. 75-76.]

73.     The RPD's Internal Affairs policy for investigating complaints relating to the conduct of RPD officers is consistent with policies of other police agencies in North Carolina and

throughout the country and will identify officers who fail to comply with the RPD's policies and who should receive additional training or discipline. There is no indication or information that the policy is not being followed or that complaints are not investigated, and appropriate action taken. [Avery Decl. ¶ 16, p. 5.]

74.     The RPD has a comprehensive Officer-Involved Shootings and In-Custody Deaths policy. Consistent with best practice, the policy makes clear that the State Bureau of Investigation will conduct all criminal investigations of in-custody deaths and officer-involved shootings that result in personal injury or death. The RPD policy directs that the Internal Affairs Unit will conduct a separate administrative investigation.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 166, p. 76.]

**The Raleigh Police Department's Training**

75.     In 1971, the State of North Carolina created the Criminal Justice Education and Training Standards Commission (hereinafter, the "CJETSC").  Starting in 1973, the CJETSC adopted minimum entrance standards and mandatory basic training requirements for all sworn law enforcement officers.  The Criminal Justice Standards Division administers the Commission's mandatory certification and training programs which cover all sworn police officers, correctional officers, probation/parole officers, juvenile justice officers, and juvenile court counselors.  [Combs Decl. ¶ 14; see also, Avery Decl. ¶ 8.]

76.     Pursuant to 12 NCAC 09B .0205 BASIC LAW ENFORCEMENT TRAINING, "The basic training course for law enforcement officers shall consist of instruction designed to provide the trainee with the skills and knowledge to perform those tasks essential to function in law enforcement. The course entitled 'Basic Law Enforcement Training' (hereinafter, "BLET") shall consist of a minimum of 640 hours of instruction." The course currently contains 36 blocks of instruction.  [Combs Decl. ¶ 20, p. 6.]

77.     The North Carolina Justice Academy housed within the N.C. Department of Justice prepares lesson plans for basic and in-service training.   These lesson plans must be used in basic and in-service training. [Avery Decl. ¶ 9, pp. 3-4.]

78.     In developing the mandated lesson plans for BLET, the Justice Academy consults subject matter experts and relies upon published and peer reviewed sources of best law enforcement practices. The lesson plans and training materials are constantly updated to reflect current best practices of police agencies. BLET covers all topics and issues an entry level police officer is likely to face and the constitutional and statutory limits on law enforcement authority. Each approved law enforcement training academy must use the current lesson plans.  [Avery Decl. ¶ 10, p. 4.]

79.     Police officers must successfully complete the mandated basic training and pass a state certification examination to become a sworn police officer. [Avery Decl. ¶ 9, pp. 3-4.]

80.     The Raleigh Police Department (RPD), like most large agencies, operates its own basic school academy to train new officers in accordance with CJETSC rules. An academy like RPD's must use the mandated lesson plans but can include additional training. The training of RPD officers exceeds the minimum requirements of the CJETSC for training of police officers.  [Avery Decl. ¶ 11, p. 4.]

81.     RPD officers are not allowed to work as law enforcement officers unless they successfully complete the mandated training, pass the State certification exam, are certified by CJETSC, and maintain certification by CJETSC.  [Avery Decl. ¶ 12, p. 4.]

82.     Officers must successfully complete mandated in-service training to remain employed as a police officer in North Carolina.  [Avery Decl. ¶ 9, pp. 3-4.]

15

83. Failure to complete in-service training will result in suspension of an officer's certification as a law enforcement officer. [Avery Decl. ¶ 14, p. 5.]

84. The Justice Academy surveys North Carolina law enforcement agencies to determine issues to address in the mandated annual in-service as well as court rulings and legislative changes which impact law enforcement and the performance of law enforcement duties. All law enforcement officers must attend twenty-four (24) hours of annual in-service training. Fourteen (14) of the in-service hours are topics prepared by the Justice Academy which can include firearms, legal update, and working with victims of trauma. The head of the agency can select ten (10) other hours involving any topic if there is a lesson plan written in Instructional Systems Design format and is taught by an instructor who is certified by the CJETSC. [Avery Decl. ¶ 13, pp. 4-5.]

85. From 1996 to 2018, Sherry Hunter served as the Training Director for the RPD. At the time of her deposition on October 29, 2021, Ms. Hunter was the person with the most knowledge of the RPD's training employed by the City. [Hunter Depo. at 14.]

86. Throughout Ms. Hunter's employment with the City, the RPD required a minimum of forty (40) hours of annual in-service training for its sworn law enforcement officers. [Hunter Depo. at 18-20.]

87. All RPD officers are required to complete all training courses and take all tests mandated by the State of North Carolina. The RPD updates each officer's training records to reflect completed training and conducts an audit of all training records at the end of each year. [Hunter Depo. at 35.]

88. The RPD is required to report any officers who fail to complete all required in-service training to the CJETSC, and officers who fail to complete training may have lose their law enforcement certifications. [Hunter Depo. at 35-36.]

16

89.    From 2014 to 2019, the State of North Carolina required law enforcement officers to receive annual legal updates as part of mandatory in-service training.  [Hunter Depo. at 29.]

90.    The RPD's training of its officers is consistent with training provided by other law enforcement agencies and informs RPD officers of their constitutional duties they are likely to face when performing their duties.  [Avery Decl. ¶ 24, p. 7.]

**Officer Edwards' Training**

91.    Officer Edwards was hired as a police officer with the RPD effective April 10, 2000.  [Combs Decl. ¶ 11, p. 4.]

92.    Officer Edwards attended the 76th session of the Raleigh Police Academy from June 26 to December 15, 2000 and completed a total of 932 hours. The minimum number of hours required for the basic law enforcement certification at that time was 602 hours over 34 separate blocks of instruction. The RPD added an additional 330 hours of training during the basic police academy to bring the initial training hours to 932.  [Combs Decl. ¶ 21, pp. 6-7.]

93.    Officer Edwards received his General Law Enforcement Certification from the CJETSC on December 15, 2001.  [Combs Decl. ¶ 11, p. 4.]

94.    Officer Edwards applied to the CJETSC for his Intermediate and Advanced Law Enforcement Certificates on December 3, 2014. As of that date Officer Edwards had accumulated a total of 1222.8 hours of training. Officer Edwards was awarded his Advanced Law Enforcement Certificate on February 13, 2015.  This certification is awarded and signed by the NC Attorney General, Commission Chairman, and the Criminal Justice Standards Director and Commission members recognizing advanced training hours, years of experience, and education.  [Combs Decl. ¶ 11, p. 4; ¶ 21, pp. 6-7.]

95.     Officer Edwards' RPD training records show a pattern of standardized training, up-to-date ongoing mandated in-service courses, and numerous "in-house" training courses. [Combs Decl. ¶ 13, p. 4.]

96.     Officer Edwards' training records also include numerous specialized and advanced training certificates, which is common for officers who have the initiative to develop specialized knowledge and skills.  [Combs Decl. ¶ 11, p. 4.]

97.     Officer Edwards' training records reveal no training gaps or other omissions in the materials that could be associated with negligent hiring, retention, or training.  [Combs Decl. ¶ 12, p. 4.]

98.     Officer Edwards' RPD training records reveal nothing that would have caused the RPD to suspect that Officer Edwards had demonstrated any past, current, or potential performance problem based on a lack of appropriate training, and therefore in need of additional and/or remedial training.  [Combs Decl. ¶ 13, p. 4.]

99.     The RPD provided Officer Edwards not only the required training mandated by the CJETSC, but also provided additional training well above and beyond the minimum requirements. The training provided was appropriate and consistent with industry-standard operational practice. [Combs Decl. ¶ 10, p. 3.]

**The Raleigh Police Department's Training Regarding Use of Force**

100.     During BLET, Officer Edwards received and passed the block titled "Defensive Tactics" (revised February 1999). This was a 16-hour block covering physical techniques of arrest and control along with use of force concepts and levels.  [Combs Decl. ¶ 23, p. 7.]

18

101.    Officer Edwards' training records indicate that he completed standard departmental training each year to include firearms qualifications and mandatory in-service training.  [Combs Decl. ¶ 11, p. 4.]

102.    The RPD continued to provide Officer Edwards with training in use of force that was not only adequate, but that has gone well above and beyond what is required by CJETSC. [Combs Decl. ¶ 27, pp. 8-9.]

103.    Annual firearms training encompasses use of force.  While the State of North Carolina typically mandates four (4) to six (6) hours of annual firearms training, the RPD has typically required its officers to receive at least sixteen (16) hours of annual training on firearms and the use of force.  The use of force training provided by the RPD covers state-mandated topics as well as the RPD's use of force policy.  [Hunter Depo. at 29-31.]

104.    To help officers distinguish between deadly threats and non-deadly threats, the RPD provides reality-based and scenario-based training.  In addition, the RPD provides a stress course as part of firearms training that includes shoot/don't shoot scenarios.  [Hunter Depo. at 34.]

105.    Officer Edwards' training records that begin in May of 2002 and end in December of 2019 show that he received training in firearms every year during annual qualifications. During mandated in-service firearms training (minimum 4 hours of training), there is a classroom portion during which the instructor will cover use of force, and in particular, the use of deadly force as it pertains to firearms use. In addition, Officer Edwards received his initial TASER certification in 2007 consisting of twenty-four (24) hours of training, and thereafter received an eight (8) hour TASER recertification update course each year, during which the use of force was also covered. Further, the RPD also provided Officer Edwards with the following Subject Control & Arrest Techniques ("SC/AT") training updates:

19

2002 SC/AT and Driving (8 hours)

2003 SC/AT Train-the-Trainer (8 hours)

2004 SC/AT Update (4 hours)

2008 SC/AT Update (8 hours)

2011 SC/AT & Simunitions (8 hours)

[Combs Decl. ¶ 27, pp. 8-9.]

106.    The RPD's training with regard to use of force is voluminous and beyond what most agencies do.  The RPD is doing everything that they should do to help officers make good decisions in the use of force context.  The RPD provides training on both skills and decision-making.  Many agencies just do the "how to" not the "when to."  [Ryan Depo. at 155-156.]

107.    During the five (5) year period preceding his encounter with Mr. Mojarrad, Officer Edwards received training on the RPD's use of force policy twice per year during firearms training, once per year during TASER recertification, and once per year during reality-based training. [Rowland Depo. at 84.]

108.    On November 16, 2018, less than six (6) months prior to his encounter with Mr. Mojarrad, Officer Edwards participated in TASER recertification training.  This program included a training scenario involving a subject who advanced aggressively toward Officer Edwards from a distance of fifteen (15) to twenty (20) feet while armed with a knife.  In response to the armed subject, Officer Edwards issued verbal commands to drop the knife and stop.  When the armed subject began to approach, Officer Edwards drew his weapon and continued issuing commands to drop the knife.  When the subject continued to ignore his commands, Officer Edwards fired two shots at the subject.  After the subject was down, Officer Edwards removed the knife from the subject's proximity and used his radio to request assistance.  At the conclusion of the training

20

scenario, the training instructor de-briefed Officer Edwards regarding his decision-making process and concluded that Officer Edwards' use of force was proper. [Rowland Depo. at 105-109.]

109. On March 6, 2019, approximately six (6) weeks prior to his encounter with Mr. Mojarrad, Officer Edwards completed in-service training mandated by the CJETSC that included a legal update. Typically, officers are required to complete a test for any in-service training mandated by the CJETSC. [Rowland Depo. at 95-97.]

110. The following day, on March 7, 2019, Officer Edwards completed mandatory day and night firearms qualification training. As part of firearms qualification, Officer Edwards received training on the RPD's use of force policy as well as N.C.G.S. § 15A-401. [Rowland Depo. at 92-93.]

111. The "Night Decision-Making Course of Fire" training conducted on March 7, 2019, usually requires officers to make decisions whether to shoot or not shoot at particular types of targets. Typically, this type of training is followed by a debrief of the trainee regarding his or her decision-making process. [Rowland Depo. at 93-94.]

112. In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he did not review any of the RPD's written training materials regarding use of force. [Noble Depo. at 109-112.]

113. Mr. Noble has testified that he does not know how the RPD trains the "21 Foot Rule". [Noble Depo. at 118.]

114. Mr. Noble has testified that he is unable to offer an opinion that the RPD's training on use of force is deficient in any way. [Noble Depo. at 118-119.]

115.    In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he is unable to offer an opinion that the RPD's training with respect to use of force is deficient. [Alpert Depo. at 120-125.]

**The Raleigh Police Department's Training Regarding
Interactions with Mentally Ill Persons**

116.    The RPD's training concerning interacting with persons with mental health issues is consistent with training in other agencies in North Carolina and throughout the country. [Avery Decl. ¶ 18, p. 6.]

117.    The training, policies, practices, and supervision undertaken by the RPD, meet or exceed generally accepted policies, practices, training, supervision, and legal mandates trained to supervisors and executive level law enforcement practitioners regarding de-escalation. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶¶ 157-158, pp. 72-73.]

118.    The RPD's training on de-escalation is consistent with other agencies in North Carolina and throughout the country. De-escalation training was provided in 2018 as part of the mandated in-service training. [Avery Decl. ¶ 19, p. 6.]

119.    The training provided by the RPD for dealing with persons in crisis far exceeds current training in law enforcement nationwide. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 165, p. 75.]

120.    BLET includes a twenty-four (24) hour block of instruction that includes classroom and practical exercises, entitled "Individuals with Mental Illness and Developmental Disabilities." The lesson plan indicates that officers are taught effective responses to persons with mental illness or developmental disabilities including de-escalation. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 163, p. 75.]

121.     During BLET, one of the blocks of instruction that Officer Edwards received and passed was "Crisis Management" (revised December 1998). This block of instruction consisted of 10 hours of classroom and role-play scenarios covering conflict and crisis theories along with safety techniques and procedures, to include alternatives available to the officer after assessment. [Combs Decl. ¶ 22, p. 7.]

122.     During BLET, Officer Edwards received and passed the twelve (12) hour training block "Special Populations" (revised December 1998). This block presented an overview of mental disorders, physical disabilities, communication disorders, and unusual behaviors that a law enforcement officer may encounter, and provided methods for the officer to identify, communicate with, and assist disabled or disordered persons. This block used classroom instruction and a minimum of 6 scenarios for evaluation.  [Combs Decl. ¶ 24, p. 7.]

123.     Crisis Intervention Team (CIT) training is a 40-hour program comprised around 5 key themes: Understanding Behavioral Health, Developing Empathy, Navigating Community Resources, De-escalation Skills and Practical Application.  [Combs Decl. ¶ 30, p. 10.]

124.     CIT training has not yet reached the level of common industry standard training for all law enforcement officers. As of June 9, 2020, the four most recent Raleigh police academy classes had completed forty (40) hours of CIT training prior to or during their Field Training period. In 2017, approximately 450 sworn and civilian personnel of the RPD, who were not certified as CIT Officers, completed an eight (8) hour course and received a Mental Health/First Aid certification.  [Combs Decl. ¶ 29, pp. 9-10.]

125.     The CIT training program is not mandated nor regulated by the CJETSC which has oversight and control of all NC law enforcement standardized and required training. [Combs Decl. ¶ 31, p. 10.]

126.     The RPD is far ahead of agencies throughout the United States with a large percentage of RPD officers, including Officer Edwards trained as CIT officers.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 160, pp. 73-74.]

127.     Officer Edwards completed the 40-hour "Crisis Intervention Team" training on September 23, 2016.  [Combs Decl. ¶ 31, p. 10.]

128.     Since 2006, the RPD has covered the following training topics during annual in-service training:

- 2019 Individual Wellness: Coping with Stress and PTSD (2 hours)

- 2018 Communication Skills with Persons in Crisis/De-escalation Techniques (4 hours)

- 2017 Protecting our Officers: Suicide Prevention for Law Enforcement (2 hours)

- 2016 Critical Incident Stress Debriefing (2 hours)

- 2015 Mental Illness Awareness/Dr. Julanne Erickson, RPD Psychologist (2 hours)

- 2013 Responding to Individuals with Mental Illness (2 hours)

- 2012 Awareness of Issues Surrounding Returning Military Personnel (2 hours)

- 2010 Suicide by Cop and Force Options (2 hours)

- 2008 Emotional Survival for Law Enforcement Officers (8 hours)

- 2007 Interacting with Special Populations (4 hours)

- 2006 CIT Overview (1 hour)

[Combs Decl. ¶ 28, p. 9.]

129.     In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he is unaware of any evidence showing deficiencies in the RPD's training regarding interactions with mental health consumers.  [Noble Depo. at 117.]

130.     In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he is unable to offer an opinion that the RPD's training regarding officer interactions with mental health consumers is deficient.  [Alpert Depo. at 125.]

**The Raleigh Police Department's Training Regarding Body-Worn Cameras**

131.     In his role as an expert witness for the Plaintiff, Mr. Jones has testified that the RPD's BWC training complies with best practices for BWC training and is either in keeping with or somewhat more detailed than BWC training offered by other law enforcement agencies.  [Jones Depo. at 119-120.]

132.     Mr. Jones has testified that he does not believe that the RPD's BWC training was deficient in any way.  [Jones Depo. at 117.]

133.     Mr. Jones has testified that he believes that there is nothing that the RPD did or failed to do with regard to its BWCs that affected Officer Edwards' decision to use deadly force against Mr. Mojarrad.  [Jones Depo. at 117-118.]

134.     In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he is unaware of any evidence showing deficiencies in the RPD's training regarding BWCs.  [Noble Depo. at 117-118.]

135.     In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he has not formed the opinion that the RPD's training regarding BWCs is deficient.  [Alpert Depo. at 125.]

**The Raleigh Police Department's Supervision of Officer Edwards**

136.     Mr. Ryan conducts audits of the internal affairs process / supervisory processes of law enforcement agencies on a fairly regular basis.  In his role as an expert witness for Officer

Edwards, Mr. Ryan has testified that there is nothing that he believes that the RPD could have done better with respect to its supervision of Officer Edwards. [Ryan Depo. at 172.]

137. Mr. Ryan reviewed Officer Edwards' Internal Affairs records which revealed no complaints related to the use of deadly force prior to April 20, 2019. Other complaints regarding Officer Edwards were thoroughly investigated and sustained when there was evidence of a violation. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 172, p. 77.]

138. Officer Edwards' records include an incident in 2004 when he discharged his firearm at a charging pit bull. Mr. Ryan believes that the RPD conducted a thorough investigation and concluded that Edwards's conduct was proper. [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 171, p. 77.]

139. In his role as an expert witness for the Plaintiff, Mr. Noble has testified that he has formed no opinion regarding the adequacy of the RPD's supervision of Officer Edwards and knows of no evidence suggesting that the RPD's supervision of Officer Edwards was deficient in any way. [Noble Depo. at 121-122.]

140. In his role as an expert witness for the Plaintiff, Dr. Alpert has testified that he does not have sufficient information to conclude that the RPD failed to adequately supervise Officer Edwards. [Alpert Depo. at 130.]

**The Raleigh Police Department's Supervision Regarding Use of Force**

141. The RPD's policy on investigating use of force by its officers is consistent with the best practices of law enforcement agencies in North Carolina and throughout the country. These best practices include:

a) Every significant use of force by an officer is investigated by a supervisor not involved in the encounter and not involved in the supervision of the officer using the force.

b) Any violation of policy during a use of force encounter can result in discipline or additional training.

c) Every use of deadly force resulting in death or serious injury is investigated by two separate entities. An outside agency, the State Bureau of Investigation, conducts an independent investigation and reports its findings to the Wake County District Attorney, who determines if an officer has committed a criminal law violation. The Internal Affairs section of the RPD conducts a separate investigation to determine if the RPD's policies were violated during the encounter. Discipline or additional training can be required for policy violations even if no law violation is found.

d) RPD officers receive a review of the use of deadly force once or twice a year when they are required to qualify with their handgun(s) and also during mandatory in-service training.

[Avery Decl. ¶ 17, p. 5.]

142.    The RPD's policies on reporting any use of force and a supervisory review of the propriety of the use of force is designed to and does hold officers accountable for the improper use of force. The RPD's policy on reporting use of force is consistent with other law enforcement agencies in North Carolina and throughout the country. There is no indication or information that the use of force reporting policy is not being followed or enforced.  [Avery Decl. ¶ 21, p. 6.]

143.    The thorough investigation of use of force by RPD officers establishes that the RPD has created a climate demanding using force only when necessary and officers must comply with the RPD's training and policies.  [Avery Decl. ¶ 22, pp. 6-7.]

**The Raleigh Police Department's Supervision Regarding Body-Worn Cameras**

144.    One of the recommended practices with respect to supervisory practices is video audits on Mobile Video Recordings and BWCs, with documentation filled out by the reviewing supervisor. The RPD has adopted this best practice dating back at least until 2018.  [Ryan Decl. ¶ 8, p. 3; Ex. B to Ryan Decl. ¶ 170, pp. 76-77.]

145.    In his role as an expert witness for the Plaintiff, Mr. Jones has testified that no BWC audit of Officer Edwards conducted by the RPD prior to Officer Edwards' interaction with Mr. Mojarrad revealed that Officer Edwards was violating the RPD's BWC policy.  [Jones Depo. at 114-116.]

**The City of Raleigh's Liability Coverage Arrangements**

146.    The City does not participate in a risk pool and has not participated in a risk pool for many years prior to April 2019.  [Wilson Decl., D.E. 62-1 ¶ 4.]

147.    From July 1, 2018 through July 1, 2019, the City had in effect excess liability insurance coverage for general liability, which provided coverage for certain types of claims or judgments as specified in the particular policy when the amount of those claims exceeded $1,000,000.00.  During this period, the City purchased an insurance policy to provide a total of $10,000,000.00 in excess liability insurance coverage. The City was during this period and currently remains wholly uninsured for general liability claims under $1,000,000.00 or above $11,000,000.00.  [Wilson Decl., D.E. 62-1 ¶ 5.]

148.    The City has had a self-insured retention on its liability insurance coverage for more than a decade.  [Tatum Decl., D.E. 62-2 ¶ 4.]

149.    From July 1, 2018 to July 1, 2019, the above-described insurance coverage was provided pursuant to a Lloyd's Certificate (Policy Number PK1028818) (hereinafter, the "Policy").  The Policy had aggregate limits of $10,000,000.00 with a self-insured retention of $1,000,000.00.  Therefore, the Policy provided $10,000,000.00 in coverage for certain specified claims and judgments in excess of $1,000,000.00.  [Wilson Decl., D.E. 62-1 ¶ 6.]

150.    In 1999, the Raleigh City Council enacted Waiver of Immunity Interim Guidelines authorizing the City to waive governmental immunity and immunity for public officials acting in their official capacity in certain limited circumstances and for certain claims under $1,000,000.00. The City may not waive governmental immunity or immunity for public officials unless the prerequisites and conditions of the Waiver of Immunity Interim Guidelines are strictly observed. [Wilson Decl., D.E. 62-1 ¶ 7.]

151.    The City waives its sovereign immunity only in accordance with the Waiver of Immunity Interim Guidelines.  A plaintiff accepting the terms of the City Council's waiver cannot reserve any claim against any person or entity and must execute the City's release to receive payment.  [Tatum Decl., D.E. 62-2 ¶ 4.]

152.    Further, pursuant to the Waiver of Immunity Interim Guidelines, the City may waive its sovereign immunity only for those claims proximately caused by the wrongdoing or negligence of the City or its employee.  [Tatum Decl., D.E. 62-2 ¶ 4.]

153.    The City and its independent liability adjusters apply and adhere to the Waiver of Immunity Interim Guidelines.  [Wilson Decl., D.E. 62-1 ¶ 8.]

154.   The Raleigh City Attorney, Robin L. Tatum, is the only City official authorized by the Raleigh City Council to settle claims.  [Tatum Decl., D.E. 62-2 ¶ 5.]

155.   The Raleigh City Attorney's Office has handled the above-captioned lawsuit since Plaintiff filed it on June 9, 2020.  [Tatum Decl., D.E. 62-2 ¶ 6.]

156.   As of February 4, 2022, the Plaintiff in this lawsuit has not executed a release of all persons, firms, and corporations arising out of the claims asserted in the Complaint.  [Tatum Decl., D.E. 62-2 ¶ 7.]

This the 7th day of April, 2022.

> **CITY OF RALEIGH**
> **Robin L. Tatum**
> **City Attorney**
>
>
> By:   /s/  Hunt K. Choi
> HUNT K. CHOI
> Deputy City Attorney
> NC State Bar No. 24172
> Post Office Box 590
> Raleigh, North Carolina 27602
> Telephone: (919) 996-6560
> Facsimile: (919) 996-7021
> Email:  hunt.choi@raleighnc.gov
> *Counsel for City of Raleigh, North Carolina*
>
> /s/ Rachel E. Keen
> Rachel E. Keen
> NC State Bar No. 27777
> /s/ Sonny S. Haynes
> Sonny S. Haynes
> NC State Bar No. 41303
> WOMBLE BOND DICKINSON (US) LLP
> One West Fourth Street
> Winston-Salem, NC 27101
> Telephone: (336) 721-3600
> Email: Rachel.Keen@wbd-us.com
> Email:  Sonny.Haynes@wbd-us.com
> *Counsel for City of Raleigh, North Carolina*

30

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 7th day of April, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Catherine E. Edwards, Esq.
Kristen L. Beightol, Esq.
EDWARDS BEIGHTOL, LLC
PO Box 6759
Raleigh, North Carolina 27628
Telephone: (919) 636-5100
Facsimile: (252) 408-6856
*Attorneys for Plaintiff Siavash Mojarrad*
Email: cee@eblaw.com
          klb@eblaw.com

Dan M. Hartzog, Jr., Esq.
Katherine Barber-Jones, Esq.
Hartzog Law Group, LLP
1903 N. Harrison Avenue, Suite 200
Cary, North Carolina 27513
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendant William Brett Edwards*
Email: dhartzogjr@hartzoglawgroup.com
          Kbarber-jones@hartzoglawgroup.com

And I hereby certify that I have mailed the document to the following non CM/ECF participants:

This the 7th day of April, 2022.

**CITY OF RALEIGH**
**Robin L. Tatum**
**City Attorney**


By:     /s/  Hunt K. Choi
          HUNT K. CHOI
          Deputy City Attorney
          NC State Bar No. 24172
          Post Office Box 590
          Raleigh, North Carolina 27602
          Telephone:  (919) 996-6560
          Facsimile:  (919) 996-7021
          Email:  hunt.choi@raleighnc.gov
          *Counsel for City of Raleigh, North Carolina*